[Civ. No. 11975–S.   Second Appellate District, Division One.—January 12, 1939.]

In the Matter of the Estate of EMELIE G. CUSHING, Deceased. ANDREW J. POWELL, Appellant, v. R. H. PORTEOUS, Executor, etc., et al., Respondents.

Frank E. Kilpatrick, Henry H. Kilpatrick and Booth B. Goodman for Appellant.

Knight & McCarthy, Newton M. Todd and Fred A. Watkins for Respondents.

DORAN, J.—This is an appeal from an order admitting to probate the will of Emelie G. Cushing, deceased. The order was made following a contest of the will, before a jury. ▇ At the close of contestant's case, the trial court granted a motion for nonsuit as to each of the grounds upon which the contest was based, namely, incompetency, undue influence and fraud. Letters testamentary were thereafter issued to respondent R. H. Porteous, executor without bond, and the principal devisee and legatee.

Testatrix at the time of her death on April 4, 1937, at Long Beach, California, was 81 years of age. Mrs. Cushing's children had died in their infancy, and her only surviving relatives were Andrew J. Powell, contestant herein, who was her

half-brother (they were children of the same mother), and his married daughter, Helen Powell Doane. Dr. Powell, who was 74 years old at the time of the trial, was at one time a practicing dentist at Hayward, California, but had retired from active practice some twenty years previously due to ill health. He was not mentioned in the will.

The evidence reveals that in 1932, respondent R. H. Porteous, a married man 42 years of age, was employed on a parking lot in Long Beach, a short distance from the Elks Club. Mr. Ed Cushing, the husband of the decedent, who was a member of the Elks Club, and who resided at the Imperial Hotel located within a block of the club, became casually acquainted with Porteous at that time. A few days after their first meeting, Mr. Cushing, who was out walking with his wife, introduced her to Porteous, and from time to time thereafter Mr. and Mrs. Cushing would give Porteous a dollar or two as a present, because, as respondent testified, they "felt sorry" for him. Porteous joined the Elks Club in 1933, and shortly thereafter procured a position in the club as a servant. Upon only one occasion during Mr. Cushing's lifetime, and only for a few minutes, did Porteous visit the Cushings at the hotel where they resided; that occasion arose when he happened to walk home with them.

Mr. Cushing died in October of 1935. Within a week after Mr. Cushing's death respondent Porteous called upon Mrs. Cushing and informed that her husband had told him to look after her. He began to visit her regularly every day at her apartment, and in 1936 these visits increased to an average of five times a day. He displayed great affection toward her, called her "Mother", and according to his own testimony, told her that he loved her just like his own mother. He usually kissed her upon arrival and upon leaving. Continuous gifts of money were given to him by Mrs. Cushing, with part of which he bought her flowers and candy, the balance being used to defray his own expenses.

In February of 1936 Mrs. Cushing suffered a fall requiring her to be confined to her bed for several months. Her condition became progressively worse, mentally and physically, and to facilitate the management and care of her property, and at the suggestion of Mrs. Cushing's banker, a Mrs. Mary C. Walters, who was employed as a day clerk at the apartment hotel for a number of years and who knew both Mr. and Mrs.

Cushing during that time, was appointed guardian by the court on May 25, 1936. Four months later, to wit, on September 28, 1936, Mrs. Cushing's condition having improved, and through action taken by Mr. Porteous' attorney, she was restored to capacity. On the following day, namely, on September 29, 1936, Mrs. Cushing executed a general power of attorney in which Porteous was made her attorney in fact; and, on the same day, the will in question was executed.

In October of 1936 Porteous was given a new Dodge automobile by Mrs. Cushing and a two-carat diamond ring which had formerly belonged to her husband, and which Porteous had Mrs. Cushing give to him in front of his attorney so that he "would have proof that she gave it" to him.

In August of 1936 a Mrs. Gladys Livesey was employed as a practical nurse, secretary and companion to Mrs. Cushing. It appears that Mrs. Cushing's property and financial investments were largely in the hands of a man by the name of Frank Williams, who lived in Stockton, and who was an old friend of the Cushings.

On January 9, 1937, Mrs. Livesey wrote to Mr. Williams as follows:

"Private and Confidential.

"Dear Mr. Williams:

"Received your letter dated January 7th this morning; I was very glad to learn that you were interested and concerned in Mrs. Cushing's health.

"In my opinion, her health has improved considerably within the last six weeks, she now walks without her stick and when we go out walking she gets about without my help, only of course when she crosses the street. The cold and damp weather affects her sore leg, and unfortunately makes her extremely nervous. Her physical condition is excellent. She does not have the need of a doctor now. If, however, I saw the slightest failure in her health I would call in her doctor without a moment's delay.

"Mr. Williams, you can rest assured that if Mrs. Cushing felt sick, though only a little alarming, I would most certainly let you know. I shall, of course, do as you suggest, keep you personally advised how she is getting along.

"The business transaction has not as yet transacted. Mrs. Cushing had to make an offer (it was not up for sale) then the Estate had to advertise the sale of the lots and ask for

bids, now they are waiting for the Court to fix a date to accept the bids. Though it was none of my affair, and I was not asked for an opinion, I was very alarmed and grieved when Mrs. Cushing spoke of changing her investments; at her age I do not think it advisable.

"I sincerely hope that everything will be all right. I thought it best to keep your letter confidential. Whilst I am in Mrs. Cushing's employ she will have the best of care, and the very best of everything. I am trying my hardest to make her life very happy, though it is pretty hard sometimes, me being a woman, and she doesn't care so much for them, but prefers men. Nevertheless I shall keep on keeping on. . . .

"Sincerely yours,

"G. LIVESEY."

The "business transaction", referred to in the letter, related to a contemplated purchase by Mrs. Cushing of three lots in Long Beach, which lots at that time were rented by a brother of Mr. Porteous for parking purposes. Subsequently these lots were purchased by Mrs. Cushing for a sum of around $29,500, and on February 19, 1937, the decedent made a gift deed conveying these three lots to Porteous.

Dr. Ralph B. Eusden, the physician who treated Mrs. Cushing during the years 1929 to 1936, testified that in 1931 Mrs. Cushing had well-marked manifestations of chronic heart failure, an infection of the bones of the skull, a severe bone infection in one leg, "plus senility and arteriosclerosis and all of those senile changes—principally of the circulatory system"; in 1935 two cancers appeared, which were treated with cautery and radium.

Dr. Eusden also testified that after Mrs. Cushing moved to the Sovereign Apartments in November of 1936, no calls were received by him to continue his professional visits. However, on March 7, 1937, about a month before the decedent's death, he received a call to visit her professionally and found the decedent in precarious health, having suffered what is commonly referred to as a "stroke". At that time an examination revealed numerous black and blue spots and contusions in various stages of duration upon Mrs. Cushing's body. Upon inquiry, the doctor learned that during the preceding two weeks Mrs. Cushing had been unsteady on her

feet, weaving and falling, and that the bruises were the result of bumping into the tables and chairs and furniture about the room.

The evidence reveals that during this last period of Mrs. Cushing's life, and while her condition was very bad, letters were sent to Mr. Williams, signed by Porteous, to the effect that her condition was improving, and, in a letter dated March 18, 1937, Porteous wrote that they were expecting Mrs. Cushing to be "up and around again like her usual self in about ten days or a couple of weeks".

A little over a week later, however, and shortly before the decedent's death, Mrs. Livesey wrote to Mr. Williams as follows:

"March 27, 1937.

"Dear Frank:

"I daresay you have wondered why I did not notify you of Mrs. Cushing's illness, as I had promised I would if ever she showed signs of failing. Mrs. Cushing took suddenly sick on Sunday, March 7th, at about 3 a. m. I called the doctor as early as I could, and he came down here just as soon as he got the message. He examined her thoroughly and was very kind and sympathetic and said she had a slight stroke and he was afraid she would have to remain in bed for quite a while. After he left I drafted a night letter to you (so you would get it Mon. morn). Foolishly I mentioned the fact to Bob" (Porteous) "who suggested I wait until next day and send a day letter and perhaps by then her condition would be improved. Early Mon. morning Mr. Knight rung me up and said Bob had told him I was writing you, and he forbade me to do so saying Bob was in charge and had the Power of Attorney and he would attend to it. I noticed it was attended to 4 days after. Bob and Mr. Knight are lifelong friends and if I had words about it with one the other would be against me. Those two naturally put me to a disadvantage. I was undecided whether to write you anyway or leave it to them. I left it to them, but they have not as yet told you she is a very sick lady.

"Mrs. Cushing is very very weak indeed Frank. She has not been out of bed yet, and it may be a long time before she ever will *do*. You mentioned in this last letter you wrote to Mrs. Cushing that you may come south. I wish you would

Frank. Perhaps it would be best if you would make it in the very near future. . . .

"G. Livesey."

A friend of Mrs. Livesey, one Juanita Nordham, testified that some time in November of 1936, Mrs. Cushing told her that she (Mrs. Cushing) loved Robert Porteous, and that he and his wife were estranged and not living together. Mrs. Nordman further testified as to a statement made by Mrs. Livesey to Porteous shortly after Mrs. Cushing's funeral, at which time Mrs. Livesey was alleged to have said: "We led you in Green Pastures, and you took all the grass and left me nothing"; also, that in a conversation, in her presence, between Mrs. Livesey and Porteous, the latter stated that he desired the handles attached to Mrs. Cushing's casket in order that he might put them on his cabin door at Lake Elsinore.

It is contended in substance by appellant that from a review of the evidence it is obvious that the court erred in granting the motion for a nonsuit. Respondents, on the other hand, contend that appellant has failed to establish any of the elements of fraud or undue influence, and that evidence of incompetency is wholly lacking.

It is too well settled to require citation of authority that a nonsuit may be granted only when, disregarding the fact,—if such is the fact,—of a conflict in the evidence and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn therefrom, the result would be a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such a verdict were returned. It is equally well settled that, " . . . the function of the trial court on a motion for a directed verdict is analogous to and practically the same as that of a reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict. Although the trial court may weigh the evidence and judge of the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict." (*Estate of Lances,* 216 Cal. 397, 401 [14 Pac. (2d) 768].) The rule applies as well to a motion for a nonsuit.

It is evident from a review of the record, the foregoing of which is a substantial but not complete account, that the

showing made by the contestant was abundantly sufficient as against a motion for a nonsuit, and that the issues raised were properly for the jury's determination.

The order is therefore reversed.

York, P. J., and White, J., concurred.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 13, 1939.